UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

THE CIVIC ASSOCIATION OF THE DEAF OF
NEW YORK CITY, INC. and STEVEN G.
YOUNGER, on behalf of themselves and
all others similarly situated,

                 Plaintiffs,                  95 Civ. 8591

   -against                               OPINION

CITY OF NEW YORK ET AL.,

                 Defendants.

------------------------------------------X

**Sweet, D.J.**


        Defendants Michael Bloomberg, as Mayor of the City of
New York, Salvatore Cassano, as Commissioner of the Fire
Department of the City of New York ("FDNY"), and the City of New
York (collectively, the "Defendants") have moved to vacate or
modify the permanent injunction imposed by the Court on February
9, 1996.[1]  The Defendants seek to vacate the injunction in order

---

[1] These individual defendants are successors to the original defendants, Mayor
Rudolph Giuliani and Commissioner Howard Safir, who were sued in their
official capacities.  These updated Defendants are automatically substituted
by operation of Fed. R. Civ. P. 25(d).  The successors to the other original
defendants (the Majority and Minority Leaders of the New York City Council,
the Speaker of the New York City Council, and City Clerk and Clerk of the New

1

to deactivate the remaining street alarm boxes in New York City, replacing them with the use of E-911 through public payphones and a tapping protocol to allow deaf and hearing impaired persons to communicate to dispatchers.  For the following reasons, Defendants' motion is denied.

## I. Prior Proceedings

The Civic Association of the Deaf of New York City, Inc. and Stephen G. Younger, II (collectively, the "Plaintiffs") filed a putative class action on October 10, 1995, seeking to enjoin Defendants from removing street alarm boxes[2] under the Americans with Disabilities Act of 1990 (ADA), the Rehabilitation Act of 1973 (RA), and the equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution.  On February 13, 1996, the Court certified

─────────────────────────

York City Council, all sued in their official capacities) take no position on this motion because the New York City Council is currently considering a proposed local law lifting prior local law restrictions on the deactivation of the street alarm box system.

[2] As discussed in more detail below, there are two forms of street alarm box which will be referenced in this opinion.  The ERS boxes are more modern and feature two buttons, allowing users to call and speak with either police or fire/EMS dispatchers.  The BARS boxes are older, and users pull a lever which sends an alarm to FDNY only via morse code.  Over two-thirds of the city's street alarm boxes are ERS boxes.

2

the class and found that Defendants' plan to remove the street
alarm boxes violated the ADA and RA, but not the equal
protection clauses, and enjoined Defendants from executing their
removal plan (the "injunction").  Specifically, the Court barred
Defendants from "carrying out any shutdown, deactivation,
removal, elimination, obstruction, or interference with the
existing street alarm box system, and from acting to replace the
existing accessible street alarm box system with notification
alternatives which are not accessible to the deaf."  Civic
Association of the Deaf v. Giuliani, 915 F. Supp. 622, 639
(S.D.N.Y. 1996) ("Civic I").  The Court held that the 911 system
existing at the time was an inadequate alternative to the street
alarm box system "because public telephones [did] not enable the
deaf and hearing impaired to request fire assistance directly
from the street."  Id.

Underlying the Civic I decision were two factual
findings: (1) "the evidence to date has not established that E-
911 is in place and effective," or that telephone location
information was reliable in establishing the location of the
public pay telephones; and (2) there was "no evidence" that
Defendants had effected a proposed tapping protocol by which

3

deaf and hearing impaired users of 911 and the street alarm

boxes could indicate their need for police or fire/EMS services.

Id. at 638.  The Court left open the opportunity for Defendants

to have the injunction modified or vacated "by demonstrating

that an accessible notification alternative exists.  Among the

means by which Defendants can meet this burden will be by

demonstrating that E-911 is in operation and effective

throughout the City and that a protocol has been developed

providing the deaf and hearing impaired with the ability to

report a fire."  Id. at 639.

        The Court also discussed features that would be

required to demonstrate that a system meets the requirements of

the ADA, using Defendants' E-911 system as an example:

>   Defendants are correct in asserting that E-911, if
>   operative and effective as proposed, could meet the
>   requirements of the ADA.  To do so, it would have to
>   provide the hearing impaired with a means of
>   identifying not only their location, but also the type
>   of emergency being reported.  The default response
>   currently proposed - sending a police car to all
>   silent calls - would cause needless delay in the case
>   of a fire.  A protocol similar to that currently used
>   when calls are received from ERS boxes would provide a
>   means of calling for fire assistance.  It would serve
>   to make public telephones serve a similar function to
>   that currently served by the ERS and BARS boxes.
>   Several factors, however suggest that the E-911 system
>   does not at present provide an adequate notification

4

alternative.  First, the evidence to date has not
established that E-911 is in place and effective.
Moreover, assuming that the system has gone on-line as
scheduled, there is no evidence that the system
functions as projected to identify effectively the
location of the telephone from which calls are
reported.  Second, although Defendants alluded to a
proposed protocol, no evidence has been offered that
one has been affected.  To comply with the ADA,
Defendants would have to develop such a protocol and
disseminate the fact of its existence to the deaf and
hearing impaired.

Id. at 638.


On June 11, 1996, Defendants sought to vacate the

injunction, but withdrew that attempt on April 1, 1997.

Meanwhile, on February 24, 1997, Plaintiffs moved the Court to

restore two-button alarm boxes in areas where they had been

removed or replaced as part of a pilot program before the

injunction had been ordered.  On July 28, 1997, the Court issued

an opinion holding that "one-button" emergency alarm boxes[3]

violated the ADA and RA and must be converted to "two-button"

boxes.  Civic Association of the Deaf v. Giuliani, 970 F. Supp.

352, 363 (S.D.N.Y. 1997) ("Civic II").  The Court also found

that the reduced number of boxes in pilot areas did not violate

the ADA and RA.  Id.  In rendering its decision, the Court noted

---

[3] "One-button" emergency alarm boxes did not allow the user to specify whether
the emergency required police or fire/EMS assistance.

that "[t]he question is whether modifying the injunction in this manner is consistent with the purpose behind the original relief: ensuring that the City's emergency response system comports with the Plaintiffs' right to equal access under the ADA and the Rehabilitation Act."[4]   Id. at 358.

On October 27, 1998, Defendants again sought to vacate or modify the injunction.  This motion was withdrawn on May 25, 1999.  Judgment was entered on January 21, 2000.

Defendants' current motion to vacate or modify the injunction was filed on June 23, 2010.  Oral argument took place on June 3, 2011.

## II.  Statement of Facts

### a. Street Alarm Boxes

There are currently 4,918 BARS and 10,159 ERS boxes in New York City.  Dingman Decl. at ¶ 4; Rosenzweig Decl. at ¶ 9.

---

[4] For reasons discussed below, the standard to be applied in analyzing compliance with the ADA and RA, as clarified in subsequent cases before the Second Circuit, is whether a protected group has "meaningful access," not "equal access."

ERS boxes have a red button for fire service and a blue button for police service, allowing users to visually recognize and specify the service they need. Dingman Decl. at ¶ 5; Rosenzweig Decl. at ¶¶ 9, 14. ERS boxes put the user in two-way contact with the specified emergency personnel, allowing the user to speak to a dispatcher. Dingman Decl. at ¶ 5. When an ERS button is pressed, a tone is emitted and continues until the call is answered. Rosenzweig Decl. at ¶ 21. The FDNY requires that calls be answered within ten seconds and that appropriate units are dispatched immediately, and the New York Police Department ("NYPD") also responds to alarm box calls promptly. Rosenzweig Decl. at ¶¶ 23-24; Dingman Decl. at ¶ 13. If a call from an ERS box is not answered within ten seconds, a unit is automatically dispatched to the call site. Dingman Decl. at ¶ 13. Up to 32 ERS boxes may be on a single circuit at a time, but only one two-way communication may take place on a given circuit at a time. Dingman Decl. at ¶ 14. If a circuit is already being used for a two-way communication, a call from another box on the same circuit will register the second box's location and a unit will be dispatched after ten seconds, but two-way communications cannot occur until the preceding call on the circuit has ended. Dingman Decl. at ¶¶ 13-14.

BARS boxes have a handle which sends an alarm to the FDNY via Morse code, but it does not have the capacity for two-way communications. Rosenzweig Decl. at ¶ 9; Dingman Decl. at ¶ 6. When a BARS box is activated, the FDNY sends at minimum a ladder company and an engine company to the box's location. Dingman Decl. at ¶ 7. This means that BARS boxes require no communication beyond a lever pull to get emergency fire services to the box's location. Rosenzweig Decl. at ¶ 13. However, BARS box users cannot specify a need for police services.

Street alarm boxes are located at approximately every other block on the streets of New York City, as well as on highways, terminals, and bridges and in public buildings, schools, hospitals, prisons, daycare centers, and the United Nations. Rosenzweig Decl. at ¶ 10. When a request for help is made using a street alarm box, the location of that box is instantly communicated to the dispatcher, allowing him or her to send emergency units to the box's location without any more information. Rosenzweig Decl. at ¶ 11.

The City tests ERS boxes daily to be sure they are in working order.  Rosenzweig Decl. at ¶ 22.  If any box fails the test, a Communications Electrician is immediately requested to inspect the box.  Rosenzweig Decl. at ¶ 22.  If the box is defective, it is replaced while it is repaired.  Rosenzweig Decl. at ¶ 22.  If no replacement is available, the box is draped in a sign indicating that it is temporarily out of service.  Rosenzweig Decl. at ¶ 22. If the box is in good condition but has a circuitry problem, it is draped in a sign indicating that it is out of service until it is fixed. Rosenzweig Decl. at ¶ 22.  To maximize the effectiveness of the system, adjacent boxes are powered by different circuitry. Rosenzweig Decl. at ¶ 22.

### b. The Tapping Protocol

The tapping protocol was originally developed in 1996 for use by deaf and hearing impaired persons when interacting with ERS boxes.  Dingman Decl. at ¶ 9; Guerriera Decl. at ¶ 7. The tapping protocol allows users to specify through repeated two-taps or single taps on the receiver whether they need fire or police assistance, respectively, though the two-buttons

available on an ERS box already allow users to make such a
selection by selecting the police or fire services button.
Dingman Decl. at ¶ 10; Guerriera Decl. at ¶ 7; Schroedel Decl.
at ¶ 12.  Use of the tapping protocol also prevents an ERS call
from being deemed "silent," and tapping for fire services is
considered a report of a structural fire.  Dingman Decl. at ¶
12.  Dispatchers have been trained and drilled in the tapping
protocol since 1997.  Dingman Decl. at ¶ 11; Guerriera Decl. at
¶ 10.

Calls in which the tapping protocol is heard by
dispatchers are rare.  In 2007, only 25 calls to the FDNY were
described as "tapping" calls.  Vecchi Decl. at ¶ 24.  Of those
21 were malicious false alarms, 3 did not require fire services,
and one was an actual fire, though the ERS call was the
seventeenth call reporting the fire.  Vecchi Decl. at ¶ 24.  In
2008, 12 calls to the FDNY were designated as "tapping calls."
Vecchi Decl. at ¶ 25.  Of those, 10 were malicious false alarms,
one was "unwarranted" and the last was "unnecessary."  Vecchi
Decl. at ¶ 25.  In other words, no tapping call reported an
actual emergency in 2008.  In 2009, only 6 calls to the FDNY
were designated as tapping calls, all of which were malicious

false alarms.  Vecchi Decl. at ¶ 26.  Of course, it is unclear whether the low amount of tapping calls is due to underuse of the street alarm boxes or the population's lack of familiarity with the tapping protocol.

The City has made efforts to disseminate the tapping protocol through fire safety presentations made to schools for the deaf, religious organizations, and other organizations associated with the hearing impaired.  Galvin Decl. at ¶¶ 3-4. However, the breadth and effectiveness of these distribution efforts are unclear.  The tapping protocol was not part of the FDNY's fire training efforts until the early summer of 2010. Galvin Dep. 18:9-19:6, 31:14-31:25, 46:25-47:23.

Although the Mayor's Office for People with Disabilities (MOPD) has maintained a website relating to the use of the tapping protocol on street alarm boxes and public payphones, the Defendants have not produced evidence of an effective outreach program for the deaf and hearing impaired. Schroedel Decl. at ¶¶ 7, 18.

It does not appear that the tapping protocol has ever been tested on public payphones, and the tapping protocol largely failed testing on ERS boxes. Rosenzweig Decl. at ¶ 33; Stulberg Decl. at ¶¶ 69-70.

### c. Public Payphones

When a telephone call comes into the E-911 center, the ANI/ALI database, maintained by Verizon, identifies the number and the address associated with that number. Guerriera Decl. at ¶ 12. This enables police and fire units to be directed to a public payphone's location without the caller needing to report his or her location. In 2009, the ALI/ANI database had an accuracy rate of 99.9998%. Guerriera Decl. at ¶ 13. The ALI/ANI database is run by Verizon, meaning that the City must rely on a private provider for up-to-date locations of public payphones. Rosenzweig Decl. at ¶ 34.

Public payphones are, for the most part, monitored by the New York City Department of Information Technology and Telecommunications ("DoITT"), which manages the phone franchises. Shor Dep. 20:23-21:10. However, the DoITT is not

responsible for payphones located in parks, subways, on private
property, or in public buildings.  Shor Dep. 21:12-22:25.  All
told, the DoITT is responsible for approximately 14,500 phones
within its network.  Shor Dep. 38:17.  Inspections of public
payphones are made pursuant to outside complaints and DoITT
policy considerations.  Shor Dep. 53:16-54:23.

In general, the City does control the exact number of
payphones in the City and where they are located, and franchise
holders install and remove payphones based on their
profitability, though the City can insist that a phone be placed
in a certain location for public need.  Shor Dep. 65:8-66:25,
157:3-157:15, 162:6-162:20.

New York City's public payphones are, for the most
part, not equipped with devices or services that enable deaf and
hearing impaired persons to effectively report emergencies.
Rosenzweig Decl. at ¶ 26.  While the NYPD and FDNY are equipped
to receive calls placed through Telecommunications Devices for
the Deaf (TDDs), no evidence has been presented that public
payphones have the equipment required to make such calls.
Furthermore, public payphones are not evenly distributed

throughout the City, and their numbers are in decline.
Rosenzweig Decl. at ¶ 29; Shor Dep. at 69:9-69:13.  Many public
payphones in the city are damaged and unusable.  Stulberg Decl.
at ¶ 41, Exs. 21-23.

When a person uses a public payphone to report an
emergency, they must wait for a dial tone on the receiver, place
the call, wait for the call to be answered by either a recording
or dispatcher, and communicate the form of emergency services
required.  Rosenzweig Decl. at ¶ 31.  This is unlike ERS boxes,
where a user can broadly specify the emergency without speaking
by selecting the button for the service they need.  Rosenzweig
Decl. at ¶¶ 9, 14.  Users must rely upon the tapping protocol to
communicate their emergency if they cannot speak.

For the deaf and hearing impaired, it is not possible
to tell if a payphone is working unless it has a TTY light,
which indicates visually that the phone is in working order.
Sonnenstrahl Dep. 57:1-57:14; Schroedel Dep. 46:16-46:19;
Schroedel Decl. at ¶ 11.  The same problem exists with ERS
boxes, as there is no reliable way for deaf and hearing impaired
persons to confirm that their call has been answered.

Sonnenstrahl Dep. 57:15-58:3; Schroedel Dep. 46:23-46:25.  As
initially contemplated, deaf and hearing impaired persons would
be able to feel vibrations from the ERS box when calling the
dispatcher and when the dispatcher answered (Rosenzweig Decl. at
¶ 21), but the City (in open court) and two of Plaintiffs'
witnesses have represented that the vibration system does not
work.  Sonnenstrahl Dep. 57:18-57:22; Schroedel Dep. 65:4-65:7.
Even so, it has been represented to the Court that deaf persons
have more faith in the street alarm box system than public
payphones, as they can visually specify the services they need
and trust the City to maintain the boxes.  Schroedel Decl. at ¶¶
11, 17.

### d. The Cost and Use of the Street Alarm Box System

The driving force behind the City's attempts to
deactivate the street alarm boxes is cost.  As is often the case
in matters of fiscal concern, the New York City Office of
Management and Budget (OMB) instigated a review by the FDNY of
the use and cost of the street alarm box system in 2009 and
2010.  Testimony was presented in 2010 at City Council hearings

in support of legislation permitting the removal of the alarm
boxes.  Stulberg Decl. at ¶¶ 21-26.

The City has estimated that deactivation of the boxes
in 2011 or 2012 would save it $6.3 million.  Am. Rush Decl. at ¶
3.  The City expects the annual cost of maintaining the street
alarm system to rise to $7 million by 2014.  Am. Rush Decl. at ¶
6.  Capital costs for the street alarm boxes have been projected
to be $24.8 million over the next ten years.  Am. Rush Decl. at
¶ 7.  To put these costs into perspective, the annual cost of
running a fire station is $1.7 million.  Am. Rush Decl. at ¶ 8.
All told, the estimated annual cost of the street alarm box
system for the next 10 years is $8.8 million.  Am. Rush Decl. at
¶ 9.  The FDNY is facing difficult budgetary choices, and it
would like to redirect the funds currently supporting the street
alarm box system.[5]  Supp. Rush Decl. at ¶ 5.

The use of street alarm boxes to report FDNY
emergencies has declined substantially over the past 15 years.[6]

---

[5] It appears that, in proposing to remove the street alarm boxes, the City
initially thought mobile phones would be an adequate replacement for
reporting emergencies from the street.  Stulberg Decl. at ¶¶ 20-25.

[6] The statistics provided to the Court through the Vecchi Declaration and
attached exhibits only address FDNY incidents (fire and EMS services).  While

16

Vecchi Decl. at Ex. C; Supp. Vecchi Decl. at ¶ 9, Ex. K.  In
1999, alarm boxes were used to report FDNY incidents 42,497
times.  Vecchi Decl. at Ex. C.  By 2009, that number had
declined to 12,931 times, a fall of 69.6%.  Vecchi Decl. at ¶ 8,
Ex. C.  Meanwhile, reporting verbally, through private alarm
systems and through telephone calls, increased.  Vecchi Decl. at
Ex. C.  In 2009, FDNY emergencies were reported by phone 401,056
times, dwarfing the use of street alarm boxes.  Vecchi Decl. at
¶ 8, Ex. C.  Focusing on structural fires, while the number of
these serious fires has declined over all (Rosenzweig Decl. at ¶
40, Ex. H), the amount of structural fires reported through
street alarm boxes has declined from 1,188 in 1999 to 140 in
2009, a fall of 88.2%.  Vecchi Decl. at ¶ 9, Ex. B.  The decline
in phone calls reporting structural fires was only 30.7%.
Vecchi Decl. at ¶ 9, Ex. C.

    The increase in mobile phone usage is a significant
factor in these trends.  Rosenzweig Decl. at ¶ 46.  Emergencies
are most often reported by phone, and the City has promoted
calling 911 to report emergencies.  Vecchi Decl. at ¶ 7, Ex. C;

the statistics suffer from a lack of NYPD data, the FDNY statistics show
significant trends in the use of street alarm boxes.

Rosenzweig Decl. at ¶ 41.   Street alarm boxes report only 0.5%
of all structural fires, 1.4% of non-structural fires, 0.6% of
all non-medical emergencies, and 0.2% of medical emergencies.
Vecchi Decl. at ¶ 22.   However, the rise of mobile phones and
their significance in reporting emergencies from the street does
not suggest that the deaf and hearing impaired, who cannot yet
use mobile phones to report emergencies, no longer need street
alarm boxes.   Rosenzweig Decl. at ¶ 46.

     The decline in the use of street alarm boxes has been
steady and significant and cannot be explained by a decline in
legitimate emergencies.   In 1997, there were 388,947 legitimate
fire and medical emergency incidents reported to the FDNY, 8,996
(2.3%) of which were reported through a street alarm box.   Supp.
Vecchi Decl. at ¶ 9.   By 2003, the total number of fire and
medical emergency incidents rose to 403,194, but only 3,918 (1%)
of these were reported through street alarm boxes.   Supp. Vecchi
Decl. at ¶ 9.   In 2010, the trend continued.   The number of fire
and medical emergency incidents rose again to 481,294, while the
number reported through street alarm boxes fell further to 1,770
(0.4%).   Supp. Vecchi Decl. at ¶ 9.   Thus, while the number of
legitimate incidents reported to the FDNY rose by 24% between

18

1997 and 2010, the number of legitimate incidents reported by street alarm box declined by 80%.  Supp. Vecchi Decl. at ¶ 10. Among the causes for the decline have been the promotion of alternatives to street alarm boxes and a lack of promotion of the street alarm boxes themselves.  Rosenzweig Decl. at ¶¶ 41-42.  The maintenance of street alarm boxes has also been in decline, with the rate of out of service boxes increasing from 1.9% in 2003 to 10.1% in 2008 and 9.4% in 2010.  Rosenzweig Decl. at ¶ 43.  The result of this trend is not only more boxes being in disrepair, but also the public sense that the boxes do not work.  Rosenzweig Decl. at ¶ 43.

### e. Malicious False Alarms

While the amount of emergencies reported through street alarm boxes has declined significantly, street alarm boxes are a substantial source of malicious false alarms.[7]  In 2009, 2,805 of the 3,102 FDNY incidents received from BARS boxes were malicious false alarms.  Vecchi Decl. at ¶ 15, Ex. D.  That is a 90.4% malicious false alarm rate.  Vecchi Decl. at ¶ 15, Ex. D.  ERS boxes were not as prone to abuse.  In 2009, 1,578 of

---

[7] Malicious false alarms are intentional false reports of emergencies.

the 2,847 FDNY incidents received from ERS boxes were malicious
false alarms, a rate of 55.4%.  Vecchi Decl. at Ex. D.  In 2009,
the FDNY responded to 447,639 calls for actual fire/EMS
emergencies (that is, all calls that were not malicious false
alarms) from all reporting sources, among which 911 was the
largest.  See Vecchi Decl. Ex. D.  Of these calls, only 0.4%
(1,935 of 447,639) originated from street alarm boxes, and many
of those calls were redundant reports.  See Vecchi Decl. at ¶ 10
& n.4, Ex. D.  In all, the street alarm box system is
responsible for 2.7% of the incoming calls but 43.3% of
malicious false alarms burdening the FDNY.  Vecchi Decl. at ¶
18, Ex. D.  In total, nearly 11,000 malicious false alarms came
in from street alarm boxes that year.  See Vecchi Decl. Ex. D.
The malicious false alarm rate for street alarm boxes is 85%,
while it is 3.1% for all other sources.  Vecchi Decl. at ¶ 19,
Ex. D.  As noted above, 37 of the 43 "tapping" calls received
from ERS boxes from 2007-2009 were malicious false alarms, a
rate of 86%, while only one "tapping" call reported an actual
emergency in that time, and it was redundant.  Vecchi Decl. at ¶
27.

Malicious false alarms waste police and fire resources, delay emergency services for actual emergencies, and send emergency personnel racing through the streets of New York. Vecchi Decl. at ¶ 21. In other words, malicious false alarms carry a risk of serious harm to emergency personnel and the residents of the City. Vecchi Decl. at ¶ 21.

In response to high rates of malicious false alarms transmitted through street alarm boxes, a silent call from an ERS box between the hours of 8 a.m. and 11 p.m. will only elicit a response from the FDNY under certain circumstances. Dingman Decl. at ¶ 8. If an unintelligible voice is heard on the other end of an ERS box call between 8 a.m. and 11 p.m., emergency services will be sent to the box. Rosenzweig Decl. at ¶ 17. Also, if the tapping protocol is used on the ERS box between 8 a.m. and 11 p.m., the requested emergency services will be sent to the box's location. Rosenzweig Decl. at ¶¶ 18-19. Between the hours of 11 p.m. and 8 a.m., even silent calls will receive immediate emergency services. Rosenzweig Decl. at ¶ 16.

### f. Potential Alternatives to the Street Alarm Box System

21

The issues surrounding the use of payphones, E-911, and the tapping protocol are not unique to New York.  Research and implementation are going forward on Next Generation 911 ("NG911") and text-based emergency reporting.  NG911 is an effort to update emergency services in light of the increasing use of, and dependence on, wireless and mobile devices.  See Framework for Next Generation 911 Deployment, 76 Fed. Reg. 2297, 2297 (Jan. 13, 2011); U.S. Dep't of Transp., Research and Innovative Tech. Admin., Research Success Stories: Next Generation 911 (May 6, 2011).  As part of the planning efforts surrounding NG911, authorities have recognized that persons with disabilities now use "the Internet and wireless text devices as their primary modes of telecommunications" and governments are attempting to develop capabilities in voice and data via the Internet.  See Nondiscrimination on the Basis of Disability in State and Local Government Services; Accessibility of Next Generation 9-1-1, 75 Fed. Reg. 43,446, 43,446 (Jul. 26, 2010).  Some municipalities already accept text-based emergency reporting.  For example, Sacramento accepts emergency reporting via email from persons with disabilities.  See 75 Fed. Reg at 43,449.

22

## III. **Legal Standard**

An injunction is an equitable and "ambulatory remedy that marches along according to the nature of a proceeding." Sierra Club v. U.S. Army Corps of Engineers, 732 F.2d 253, 256 (2d Cir. 1984). As such, it is "subject always to adaptation as events may shape the need." United States v. Swift & Co., 286 U.S. 106, 114 (1932); see also Agostini v. Felton, 521 U.S. 203, 215 (1997) (injunctions subject to change in light of "a significant change in either factual conditions or the law"). Accordingly, a court may modify an injunction to accommodate changed circumstances, Davis v. N.Y. City Hous. Auth., 278 F.3d 64, 88 (2d Cir. 2002), or upon a showing that a continuation of the injunction would be inequitable, N.Y. State Ass'n for Retarded Children v. Carey, 706 F.2d 956, 967 (2d Cir. 1983); see also Fed. R. Civ. P. 60(b) (listing the grounds for relief from a final judgment or order, which include when applying the judgment "prospectively is no longer equitable" or "any other reason that justifies relief"). The district court's power to modify or vacate an injunction "is long established, broad, and flexible." Carey, 706 F.2d at 967.

23

IV.  **The ADA and RA**


Title II of the ADA, 42 U.S.C. § 12101 et seq.,
provides in relevant part that "no qualified individual with a
disability shall, by reason of such disability, be excluded from
participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to
discrimination by any such entity."  42 U.S.C. § 12132.  Section
504 of the RA, 29 U.S.C. § 794, similarly provides that "[n]o
otherwise qualified individual with a disability in the United
States... shall, solely by reason of her or his disability, be
excluded from the participation in, be denied the benefits of,
or be subjected to discrimination under any program or activity
receiving Federal financial assistance... ."  29 U.S.C. §
794(a).


Regulations promulgated by the United States
Department of Justice to implement the ADA provide that a public
entity may not:

(1) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;

(2) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others;

(3) Provide a qualified in individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(4) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with

aids, benefits, or services that are as effective as
those provided to others; [or]

\* \* \*

(7) Otherwise limit a qualified individual with a
disability in the enjoyment of any right, privilege,
advantage, or opportunity enjoyed by others receiving
the aid, benefit or service.

28 C.F.R. 35.130(b)(1).  In addition, 28 C.F.R. § 35.130
provides that "a public entity shall operate each service,
program, or activity so that the service, program, or activity,
when viewed in its entirety, is readily accessible to and usable
by individuals with disabilities...." 28 C.F.R. § 35.130(a);
Civic I, 915 F. Supp. at 635-36.  In the realm of
communications, 28 C.F.R. § 35.160(a) provides that "a public
entity shall take appropriate steps to ensure that
communications with applicants, participants and members of the
public with disabilities are as effective as communications with
others."  28 C.F.R. § 35.160(a) (quoted in Civic I, 915 F. Supp.
at 636).

26

The parties disagree over what standard of access Defendants must meet to comply with the ADA and RA.  Defendants cite a "meaningful access" standard, while Plaintiffs cite an "equal access" standard.  Plaintiffs have derived the equal access standard from regulations promulgated under the ADA. Specifically, Plaintiffs cite 28 C.F.R. § 35.130(b)(ii), which states that a public entity may not, on the basis of disability, "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," and 28 C.F.R. § 35.160(a), which states that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others."

The "meaningful access" standard urged by Defendants is found in the case law and this Court's prior rulings.[8]  In

---

[8] In Civic II, the Court referred to an "equal access" standard for compliance with the RA and ADA.  970 F. Supp. at 358.  However, the Court's holding required only meaningful access.  Defendants were not compelled to provide deaf and hearing impaired individuals with equal means to report a fire from the street, but readily accessible, effective means to do so.  Id. at 361; see also Civic I, 915 F. Supp. at 635-36.  In other words, Defendants were ordered to continue to provide meaningful access to the same emergency services.

Henrietta D. v. Bloomberg, 331 F.3d 261, 275 (2d Cir. 2003), the
Second Circuit held that the relevant measure is "whether the
plaintiffs with disabilities could achieve meaningful access."
See also, e.g., Lonberg v. City of Riverside, 571 F.3d 846, 851
(9th Cir. 2009) (stating that Title II's "prohibition against
discrimination is universally understood as a requirement to
provide 'meaningful access'" and citing cases); Iverson v. City
of Boston, 452 F.3d 94, 99 (1st Cir. 2006) ("The clear purport
of Title II is to guarantee that qualified disabled persons
enjoy meaningful access to public services, programs, and
activities."); see generally Alexander v. Choate, 469 U.S. 287,
304 (1985).  In formulating the meaningful access standard, the
Supreme Court explicitly rejected the position that all conduct
that had a disparate impact on disabled persons violated the
Rehabilitation Act, noting "two powerful but countervailing
considerations - the need to give effect to the statutory
objectives and the desire to keep § 504 within manageable
bounds." Alexander, 469 U.S. at 299.  The "meaningful access"
standard thus struck a balance between these two legitimate
goals.  See Id. at 299-301.

To the extent that the regulations cited by Plaintiffs require equal access, rather than meaningful access, public programs, they would not be enforceable.[9] See Alexander v. Sandoval, 532 U.S. 275, 285 (2001); Abrahams v. MTA Long Island Bus, 2011 U.S. App. LEXIS 9450, at *20 (2d Cir. May 5, 2011) (explaining that under Sandoval, a plaintiff must show that a "regulation applies — but does not expand — the statute"); Iverson, 452 F.3d at 100 (noting that "regulations that interdict a broader swath of conduct than the statute itself prohibits" cannot be enforced under Sandoval). In Sandoval, the Supreme Court addressed Department of Justice regulations promulgated to effectuate § 601 of Title VI of the Civil Rights Act of 1964, which forbids only intentional discrimination. See 532 U.S. at 278, 280. Because the regulations at issue proscribed activities that had a disparate impact on racial groups, "forbid[ding] conduct that § 601 permits," the Supreme Court held that the regulations were unenforceable. Id. at 285.

Case law stresses that the ADA and RA do not require equal results. The ADA and RA prohibit discrimination against

---

[9] The Court does not hold, and need not hold, that the regulations relied upon by Plaintiffs require equal access as opposed to meaningful access.

the disabled in the provision of public services, but the
statutes neither guarantee "any particular level of [services]
for disabled persons, nor assure maintenance of service
previously provided." Lincoln CERCPAC v. Health and Hosps.
Corp., 147 F.3d 165, 168 (2d Cir. 1998). In addition, the
statutes do not guarantee disabled persons "equal results" from
the provision of a public service or benefit. Alexander, 469
U.S. at 304 ("The [Rehabilitation] Act does not, however,
guarantee the handicapped equal results from the provision of
state Medicaid, even assuming some measure of equality of health
could be constructed."); see also Henrietta D., 331 F.3d at 274
(stating that Second Circuit cases applying the RA "speak simply
in terms of helping individuals with disabilities access public
benefits to which both they and those without disabilities are
legally entitled... ; the cases do not invite comparisons to the
results obtained by individuals without disabilities").

Plaintiffs' arguments for a stricter "equal access"
standard thus fail, and Defendants' proposed removal and
replacement of the street alarm system will be analyzed under a
"meaningful access" standard.

30

Standards under and requirements imposed by the RA and the ADA are effectively the same, and claims under the two statutes are generally treated identically and in tandem. <u>See</u>, <u>e.g.</u>, <u>Henrietta D.</u>, 331 F.3d at 272.

## V. <u>Discussion</u>

Defendants claim that the tapping protocol and E-911 systems meet the requirements of the ADA and RA and satisfy this court's prior holdings. They do not, and the injunction should not be lifted based on equitable considerations.

### a. **Defendants Have Failed to Satisfy the Court's Prior Holdings**

Defendants contend that the tapping protocol and E-911 provide deaf and hearing impaired persons with an "accessible notification alternative" for reporting emergencies from the street, <u>Civic I</u>, 915 F. Supp. at 639, as E-911 and the tapping protocol "provide the hearing impaired with a means of identifying not only their location, but also the type of emergency being reported." <u>Id.</u> at 638. According to Defendants, E-911 automatically provides the location

31

information of callers who contact 911 via public payphones, and the tapping protocol permits deaf and hearing impaired callers to indicate whether they are requesting fire/EMS or police assistance. (Guerriera Decl. at ¶¶ 7, 12 & Exs. E-1-E-3; Dingman Decl. at ¶ 10 & Ex. A).

Defendants have demonstrated the ANI-ALI database, through which caller identification and location information is obtained, to be accurate over 99% of the time and have pointed to procedures in place to maintain that accuracy. Guerriera Dep. 23:6-24:11, 32:7-33:24, 34:9-17; Guerriera Decl. ¶ 13. Public payphones are included in the database. Guerriera Dep. 16:9-16:21.

Defendants have also shown that a tapping protocol has existed for emergency reporting on street alarm boxes since 1996, with NYPD and FDNY call takers trained in the protocol. Defendants have also established that a similar tapping protocol exists for public payphones. According to Defendants, street alarm box calls are indistinguishable from, and treated as, E-911 calls (Guerriera Dep. 13:17-21), and call takers are trained to handle tapping protocol calls in exactly the same way,

32

whether originating from street alarm boxes or from public

payphones (Guerriera Dep. 130:4-10, 134:8-15; see also Guerriera

Decl. ¶ 8 & Exs. E-2 & E-3 annexed thereto (NYPD Communications

Section Memorandum requiring PCTs to recognize and properly

handle tapping protocol calls, whether received from ERS boxes

or from telephone calls to E-911)).

            In Civic I, the Court held as follows:

> Defendants may apply at any time to dissolve or modify
> the injunction by demonstrating that an accessible
> notification alternative exists. Among the means by
> which Defendants can meet this burden will be by
> demonstrating that E-911 is in operation and effective
> throughout the City and that a protocol has been
> developed providing the deaf and hearing impaired with
> the ability to report a fire.

915 F. Supp. at 639; see also Civic II, 970 F. Supp. at 355

("[A]n E-911 telephone system that actually identified the

location of the caller, along with the implementation of a

protocol to permit the hearing impaired to indicate the type of

emergency being reported, would be sufficiently accessible under

the ADA.")

            When the City's current effort to eliminate the street

alarm boxes was proposed in 2010, the changed circumstance was

33

considered to be the use of cell phones.  When this motion was
filed, the Defendants relied on public payphones.  However, in
practice, public payphones and the tapping protocol do not
combine to establish an adequate accessible alternative to
street alarm boxes, and they do not constitute a changed
circumstance.  Defendants claim that a call with tapping allows
a deaf or hearing impaired user to specify the needed form of
service, police or fire/EMS, and Defendants indicate that FDNY
dispatchers and NYPD call-takers are familiar with and regularly
trained in the tapping protocol.  However, Defendants have not
adequately demonstrated that the proposed alternative works.

        The record reveals that public payphones are more akin
to the one-button street alarm boxes deemed inadequate in Civic
II.  Deaf and hearing impaired persons may use the payphones to
call, but they cannot specify the type of emergency without
either speech or the tapping protocol.  This is in stark
contrast to the two-button ERS boxes, where the user can see his
or her emergency service options and select one by pressing the
appropriate button.  The tapping protocol is supposed to allow
users to specify police or fire emergencies, but public
payphones have not been tested with the tapping protocol.

34

Guerriera Dep. 98, Doc. 106-4, May 27, 2011; Dingman Dep. 56,
Doc. 106-2, May 27, 2011; Rosenzweig Decl. at 33.


        Furthermore, public payphones are privately owned and
operated, and the number of public payphones has declined
substantially over the last 15 years.  Public payphones are not
located on every other corner (like street alarm boxes) or
otherwise distributed evenly throughout the City.  In fact, the
payphones are distributed and preserved pursuant to the
commercial interests of their owners, with the City having
little say over the phones' locations.  Thus, Defendants have
not established that public pay telephones will make E-911
operational and effective throughout the City for deaf and
hearing impaired persons.  This is particularly so going
forward, as Defendants offer no basis from which the Court may
conclude that the number of payphones will not continue to
decline in the face of competition from mobile phones.  This
renders the payphones an unstable solution.


        Plaintiffs have also demonstrated that many payphones
have not been maintained in good condition by their private
owners.  The City is unable to sufficiently police the

35

maintenance and repair of public payphones, as it concedes that it has only a handful of inspectors who tend to focus on phones with histories of failure.[10]  Neither the City nor the owners of public payphones controls whether those devices are provided with dial tones by third-party providers on any given day, thus aggravating the dispersion of responsibility among the City and private actors.  Also, as noted above, because public pay telephones are privately owned, their installation, removal, upkeep and location are subject to financial, not public safety, considerations.  Stulberg Decl. ¶¶ 37-39.

All of these issues stemming from payphone ownership and maintenance are aggravated for a deaf or hearing impaired person.  If a deaf or hearing impaired caller can find a public pay telephone that is not visibly damaged or missing parts, that caller has no way of knowing if the telephone has a dial tone, if his or her call has been answered by a recording, by an operator or at all, and has no way of communicating with the operator in the absence of a tapping protocol that has been

---

[10] This practice helps contribute to the DoITT's finding that 17-25% of payphones are inoperable, which remains disconcerting even if one accounts for the repeated inspection of troublesome phones.  Whether or not inoperability rates of public payphones for emergency use are inflated, the problem is significant.

developed, disseminated and tested on such devices.  Schroedel
Decl. at ¶ 11; Rosenzweig Decl. at ¶¶ 31, 33.  Significantly, a
broken payphone appears and acts no differently from a working
payphone from the perspective of deaf or hearing impaired
persons.  Schroedel Decl. at ¶ 11.

Defendants claim street alarm boxes are no better at
indicating to a deaf or hearing impaired person that they are
working and have made contact with a dispatcher.  This appears
to be true.  Schroedel Dep. 64:5-65:7; Sonnenstrahl Dep. 57:15-
58:3.  However, this argument ignores the key fact that public
payphones are less reliable than street alarm boxes, making the
issues arising from failures to connect more troubling.
Furthermore, ERS boxes allow the user to select a police or fire
connection, making them less dependent on the tapping protocol
which must occur once a call taker has answered the call.

Defendants must not only develop a meaningful
alternative, but they must "disseminate the fact of its
existence to the deaf and hearing impaired."  Civic I, 915 F.
Supp. at 638.  Information about the payphone tapping protocol
system is being distributed to the deaf and hearing impaired

37

population in New York City through resources available on the
FDNY and NYPD websites, as well as the website maintained by the
MOPD.  Defendants further claim that instructional materials are
available on Youtube and Wikipedia.  Defendants also cite eight
religious, educational, and community organizations which serve
the deaf and hearing impaired and for which demonstrations of
the tapping protocol were made.  See Galvin Decl. at ¶¶ 3-4.
However, Defendants have not demonstrated that this information,
which is for the most part passively available on the Internet,
is actually reaching deaf and hearing impaired persons so as to
make its distribution effective.

        To the contrary, Defendants have not conducted
sufficient outreach to places where the deaf and hearing
impaired community would be more likely to obtain information.
See, e.g., Galvin Dep. 18:9-19:6, 31:14-31:25, 46:25-47:23
(indicating that the FDNY did not include the tapping protocol
in fire emergency training prior to 2010); Plummer Decl. at ¶¶
2-3, 4, 10-11.  To take an example, Defendants have not posted
any notices about the tapping protocol on the payphones
themselves.  Without sufficient education on the tapping
protocol, the deaf and hearing impaired community is left to

38

assume that standard payphones are not accessible to it.
Without such outreach, the tapping protocol cannot be deemed
effective, and the factual circumstances in this case have not
changed sufficiently to merit withdrawal of the injunction.


   b. **The E-911 and Tapping Protocol System Does Not Provide
      Meaningful Access to Emergency Service from the Street
      Under the ADA and RA**

        As noted above, Title II of the ADA, 42 U.S.C. §
12132, et seq. provides that "no qualified individual with a
disability shall, by reason of such disability, be excluded from
participation in or be denied the benefits of the services,
programs or activities of a public entity." 42 U.S.C. § 12132;
Civic I, 915 F. Supp. at 634.  The RA provides for substantially
similar protection of qualified persons.  29 U.S.C. § 794.
There is no dispute that deaf and hearing impaired persons are
qualified individuals under the ADA and RA.


        The "meaningful access" inquiry under which ADA and RA
claims are evaluated asks "not whether the benefits available to
persons with disabilities and to others are actually equal, but
whether those with disabilities are as a practical matter able
to access benefits to which they are legally entitled."

                                39

Henrietta D., 331 F.3d at 273. "Meaningful access" is not measured or defined in relation to the access that persons without disabilities have to a particular service, nor does it relate to the adequacy of services provided. See Id. at 275 (noting that the relevant measure is "whether the plaintiffs with disabilities could achieve meaningful access, and not whether the access the plaintiffs had (absent a remedy) was less meaningful than what was enjoyed by others"); Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (explaining that the disabilities statutes require that government entities enable "'meaningful access' to such services as may be provided, whether such services are adequate or not"). Rather, persons with disabilities must be able to "benefit meaningfully" from the specific service or benefit that a government entity provides. See Alexander, 469 U.S. at 302. Defendants fail to meet this standard.

Defendants claim that the E-911 system with tapping protocol provides deaf and hearing impaired persons with the required meaningful access to emergency reporting services on the street. Defendants argue that this case is like Alexander, in which Tennessee's proposed reduction, from twenty to

40

fourteen, of the number of days its state Medicaid program would
cover inpatient hospital care was challenged.  469 U.S. at 289.
In that case, it was undisputed that Medicaid recipients with
disabilities who used hospital services were more than three
times as likely to require more than fourteen days of care than
were their non-disabled counterparts.  See Id. at 289-90.  A
class of Tennessee Medicaid recipients with disabilities
challenged the proposed reduction on the grounds that the
reduction would have a disproportionate effect on them and was
thus discriminatory.  See Id. at 290.

        The Supreme Court rejected the challenge, finding that
Tennessee Medicaid recipients with disabilities would still be
able "to benefit meaningfully from the coverage they will
receive under the 14-day rule," notwithstanding "their greater
need for prolonged inpatient care."  Id. at 302.  The Court
explained that Section 504 of the Rehabilitation Act did not
require the State to alter the fourteen-day coverage benefit
being offered "simply to meet the reality that the handicapped
have greater medical needs," Id. at 303, but that the statute
instead "seeks to assure evenhanded treatment and the
opportunity for handicapped individuals to participate in and

41

benefit from programs receiving federal assistance," Id. at 304.
Thus, although the proposed reduction fell more heavily on
individuals with disabilities than it did on others, because the
reduction "is neutral on its face, is not alleged to rest on a
discriminatory motive, and does not deny the handicapped access
to or exclude them from the particular package of Medicaid
services Tennessee has chosen to provide," it did not violate
the Rehabilitation Act.  Id. at 309.


        Following Alexander, Defendants argue that, to the
extent that Defendants' proposed removal of the street alarm
boxes would be a reduction in the emergency reporting service
being offered to deaf and hearing impaired persons, the
remaining E-911 system and ANI-ALI database when used with the
tapping protocol will continue to provide those persons
"meaningful access" to emergency services.  Defendants contend
that deaf and hearing impaired individuals will still have an
effective and accessible means of directly reporting emergencies
to 911 from the street via public payphones and will be able to
"benefit meaningfully" from the E-911 system that will remain
available.  Therefore, the argument goes, removal of the street
alarm boxes will not violate the RA or the ADA.  See Id. at 302,

42

309; see also, e.g., Wright, 230 F.3d at 548 (stating that the
disabilities statutes require government entities "to enable
'meaningful access' to such services as may be provided").
Defendants also point to the Court's holding in Civic II, which
found that a street reporting system with less alarms did not
violate the ADA.  970 F. Supp. at 362-63.  In that decision,
this Court held that the relevant legal question was whether the
thinning of the system resulted in an emergency reporting system
that was "readily accessible" to the deaf and hearing impaired,
and not, as Plaintiffs had argued, whether the system was "less
accessible to the deaf than the non-deaf."  See Id. at 361.
Therefore, the inquiry focused on access and usability, as
opposed to "equal results."  See Id.; see generally Alexander,
469 U.S. at 304.

        Defendants point out that there are roughly an equal
number of public payphones and street alarm boxes in the city
(15,077 alarm boxes and over 14,500 payphones).  However, as
found above, the distribution of payphones is not even and is
determined by commercial need, not the requirements of an
emergency reporting network.  In addition, the number of

43

payphones is in decline, and payphone removals will be
determined primarily by their owners' commercial interests.

Defendants also contend that payphones are a superior
option to BARS boxes, which only connect callers to FDNY
services.  This argument suggests that BARS boxes should be
replaced by ERS boxes, which are, for the reasons discussed
above, superior to public payphones and already effectively
implemented across the city.

As explained above with regard to Defendants' failure
to satisfy this Court's prior rulings, and unlike in Alexander,
public payphones, E-911 and the tapping protocol do not provide
an accessible alternative for deaf and hearing impaired persons
attempting to report an emergency from the street.  Rather than
a scaling down of this benefit to a still meaningful level, the
removal of street alarm boxes and their replacement with
payphones, E-911, and the tapping protocol constitutes a
deprivation of a benefit provided to non-hearing impaired
persons.

44

It has already been found that Defendants have not demonstrated that the tapping protocol works on public payphones, the City does not have sufficient control over the location and maintenance of public payphones (and there are demonstrated problems with the distribution and functionality of public payphones), and information on the payphone and tapping protocol system has not been sufficiently disseminated in the deaf and hearing impaired community to be effective. Based on these findings, the Court concludes that deaf and hearing impaired persons do not have "meaningful access" to emergency services from the street without the street alarm box system. Therefore, Defendants' proposed removal of the system would violate the ADA and RA.

### g. Defendants Have Not Satisfied the Requirements to Modify or Vacate a Permanent Injunction on Equitable Grounds

As noted above, among the reasons a court may modify an injunction is when its application "is no longer equitable" or to accommodate changed circumstances. Fed. R. Civ. P. 60(b)(5). In other words, a party must show "a significant change either in factual conditions or in law." Agostini v. Felton, 521 U.S. 203, 215 (1997); see also, e.g., Davis v. N.Y.

City Hous. Auth., 278 F.3d 64, 88 (2d Cir. 2002); Sierra Club v. U.S. Army Corps of Eng'rs, 732 F.2d 253, 256 (2d Cir. 1984) (noting that "in the case of a final or permanent injunction, the inquiry . . . is whether there has been such a change in the circumstances as to make modification of the decree equitable"). While Defendants have shown that some of the factual circumstances surrounding the injunction have changed, they have not established that the injunction is now inequitable.

Defendants cite the implementation of E-911 and the tapping protocol; however, as discussed above, those changes have not rendered payphones and the tapping protocol sufficiently accessible to deaf persons to alter the Court's prior rulings.  Therefore, the "implementation" of this system constitutes no change at all.

As found above, FDNY statistics indicate that the street alarm box system generates only a small percentage of legitimate calls for assistance, while burdening the City's emergency response system with a disproportionate number of false alarms.

46

The declining use of the street alarm box system compared with 911 and other sources has escalated over the past decade, and malicious false alarms now comprise the vast majority of calls made via street alarm boxes. By comparison, only about 3% of the total calls from non-alarm box sources in 2009 were malicious false alarms. See Vecchi Decl. Ex. D.

However, while the malicious false alarm problem is significant, the FDNY has already acted to address it. The FDNY does not respond to silent calls made between 8 a.m. and 11 p.m. on ERS boxes.

In Civic I, the Court noted that, "a significant number of rescues [were] effected as a result of street reporting [from alarm boxes]." 915 F. Supp. at 635. The statistics presented by Defendants indicate that street alarm boxes play a much less significant role in overall emergency reporting today. At the same time, the permanent injunction is not in place to signify the importance of street alarm boxes in the overall emergency reporting system, in which mobile phones now appear to be most useful to the general population. Instead, the injunction recognizes that the deaf and hearing

47

impaired rely upon street alarm boxes to report emergencies from the street, a reality which Defendants' statistics do not refute.  The deaf and hearing impaired represent a small segment of the population, and the overall decline in the use of street alarm boxes does not establish that the system has become less vital to them.

Defendants argue that deaf and hearing impaired persons do not use the street alarm system, claiming that in the past three years, the FDNY has received 43 calls in which some form of tapping was perceived, of which 37 (86% of such calls) were determined to be malicious false alarms.  Only one tapping call reported an actual fire, and that call was the seventeenth report received.  Vecchi Decl. at ¶ 27.  While these statistics suggest that legitimate calls using a tapping protocol are rare, they do not establish that deaf and hearing impaired persons are not using street alarm boxes to report emergencies, just that they are not using the tapping protocol.  These statistics do not establish that deaf and hearing impaired persons no longer need street alarm boxes to report emergencies from the street.

48

In connection with the utility of the street alarm
boxes, the Defendants point out its cost, as found above.
Defendants contend that these costs impact the FDNY budget and
imply that fewer firefighters are being hired.  Though
Defendants raise these points, they do not claim that they are
eligible for the "undue burden" exception to the ADA and RA.
The cost of the alarm box system is undisputed but does not
constitute changed circumstances meriting a change in the
permanent injunction.

The Court is sympathetic to the burdens imposed by the
expensive, false-report-prone street alarm box system.  This
case is living proof of the idiom that "no good deed goes
unpunished."  The City's efforts to bring emergency services to
more people now require it to maintain those services in order
to provide deaf and hearing impaired persons meaningful access
to report emergencies and to comply with the ADA and RA.  The
injunction remains an equitable solution.

In the future, given the use of text-based
communications in the deaf and hearing impaired community,
allowing emergency reporting with mobile devices via text

message or email may obviate that community's need for street
alarm boxes to report emergencies from the street.   Regrettably,
that alternative is not yet at hand.

**Conclusion**

Based upon the facts and conclusions set forth above,
Defendants' motion to vacate or modify the permanent injunction
is denied.

It is so ordered.

**New York, NY**
**August  / 2/ , 2011**

_____
**ROBERT W. SWEET**
**U.S.D.J.**

50